## Case No. 18,269a.

### CHARGE TO GRAND JURY.

[3 Phila. 527.]

Circuit Court, District of Georgia.    Nov., 1859.

SLAVE TRADE—STATUTES—INTERPRETATION—CONSTITUTIONAL LAW.

[1. A vessel becomes liable to forfeiture because built or equipped in the United States for use in transporting slaves from one foreign country to another (Act Cong. March 22, 1794; 1 Stat. 347) as soon as any preparation of it for such purpose is made, a completion of the equipment not being necessary.]

[2. A vessel is "employed in the transportation of slaves from one foreign country to another" (Act Cong. May 10, 1800; Rev. St. U. S. § 5556), so as to be liable to forfeiture, when it is on a voyage to procure slaves for that purpose, though no slaves have as yet been taken on board.]

[3. Service on a voyage known to be for the purpose of procuring slaves for transportation from one foreign country to another is a violation of Act Cong. May 10, 1800 (Rev. St. § 5381), forbidding citizens and residents of the United States to serve on a vessel used in such transportation.]

[4. Under the power to define and punish piracies (Const. U. S. art. 1, § 8, subd. 10), congress may declare to be piracy the service of a citizen or resident of the United States on a vessel used in kidnapping the inhabitants of a foreign country for the purpose of making them slaves, or the use of a vessel owned in the United States in such kidnapping.]

[5. Congress has power to prohibit citizens and residents of the United States from engaging in the slave trade with or between foreign countries, both under the power to regulate commerce (Const. art. 1, § 8, subd. 3), and because such traffic concerns the relations between citizens of the United States and those of foreign countries.]

WAYNE, Circuit Justice (charging the grand jury).

A circumstance has recently occurred in this city which impresses the larger portion of its people, I may say all, with few exceptions, that the same vessel has been positively taken from this port to be engaged again in the same unlawful trade. This incident, with some exceptions that you may be called upon to act upon it, and upon bills for violation for the slave trade acts, induces me, for the information of yourselves and our people at large, to charge you upon the legislation of congress upon that subject, and to give its history. I shall assert nothing without the documentary annals of our country to sustain what I shall say, with such references to them as will enable any one and every one who hears me to verify or to disaffirm the conclusion of my investigation, if the latter can be done.

I proceed now to give the legislation of congress for the prohibition of the slave trade. It shall be chronological and minute, for instruction generally, and as a warning to such persons who at any time may be seduced by a corrupt avarice to engage in that inhuman trade. These enactments are in conformity with the constitution, and with that clause of it which declares that the "migration or importation of such persons as any of the states now existing shall think proper to admit, shall not be prohibited by the congress prior to the year one thousand eight hundred and eight, but a tax or duty may be imposed on such importation, not exceeding ten dollars for each person." The clause has its place in the enumerated powers of congress.

The first act was passed on the 22d March, 1794 [1 Stat. 347], when General Washington was president. It was intended to prevent any citizen or resident of the United States, from equipping vessels within the United States to carry on trade or traffic in slaves to any foreign country. The Tryphenia v. Harrison [Case No. 14,209]. That is, though slaves might be brought into the United States until the year 1808, in vessels fitted out in our ports for that purpose, they could not be carried by

our citizens or residents in the United States in such vessels into any foreign country. The forfeiture of the vessel which has been fitted out, attached when the original voyage was begun in the United States, notwithstanding a pretended transfer of her in a foreign port, and the commencement of a new voyage from such port. The Plattsburg, 10 Wheat. [23 U. S.] 133. This act is still in force. The forfeiture attaches, though the equipments of the voyage may not have been completed, it being sufficient that any preparations were made for the unlawful purpose. The act also imposes a penalty of $2,000 upon any person fitting out such vessel, or aiding or abetting to do so. And as a prevention of such a traffic was the object to be attained, the act was applied to foreign vessels in this particular, that if one of them in our port shall be suspected to be intended for the slave trade, her owner, master, or factor, each and all of them, upon the oath of a citizen of the United States to that intent, may be required to give bonds to the treasurer of the United States, that none of the natives of Africa or negroes of any foreign country, should be taken on board of her, to be sold as slaves in any foreign port whatever, within nine months afterwards. In addition, a citizen of the United States is liable to forfeiture of $200 for every person he may receive on board of such vessel for the purpose of selling them as slaves. This statute accomplished its purpose for a time. But when it was found that some of our citizens and foreigners residing in the United States, who had been accustomed to traffic in slaves, misused their privilege to bring slaves into the United States, by engaging their vessel for taking slaves from one country to another, congress passed the act of May 10, 1800 [2 Stat. 70]. It subjected to forfeiture any right or property in a vessel so employed, and the owners to pay a sum of money equal to double the value of their interest in her.

The judicial interpretation of this act, is that a vessel caught in such a trade, though it be before she has taken slaves on board, is liable to forfeiture. That a forfeiture was also incurred if slaves were carried as freight from a foreign port to another in the same kingdom; or from one foreign port to another in any other country. The act, too, declares that it shall be unlawful for any citizen of the United States or for any person residing in them to serve on board of any vessel of the United States employed in the transportation of slaves from one foreign country to another; and that for doing so they should be indicted and be subjected to a fine not exceeding two thousand dollars and imprisonment not exceeding two years. That he shall also be liable to the same fine and imprisonment for being voluntarily employed on board of a foreign vessel for the same purpose. The judicial interpretation of this act is, that actual transportation of slaves is not necessary to incur its penalties. It is enough that the vessel was bound to the coast of Africa with the intent to take slaves on board, and that the person charged with violating the act, knew that, and voluntarily served on board of her. U. S. v. Morris, 14 Pet. [39 U. S.] 464. It is not necessary to do more than to mention that there are other sections of this act providing for the capture of vessels engaged in such a trade: also for their forfeiture for the benefit of the captors, and precluding all persons interested in such vessel, her enterprise or voyage, from all rights to claim any slave on board of her, and denying to them any damages or retribution on account of her capture. This act further directs the commander of the ship, making the seizure of such a vessel, to take her officers and crew, and any person found on board of her, into custody, and to convey them to the civil authority of the United States, in some of the judicial districts, for prosecution. It had been early found that some of those persons most concerned in violating the laws, (just as it has been recently attempted,) claimed to be exempt from its penalties, on the ground of being passengers on board of the vessel seized. Congress met the artifice by declaring that all persons making such a declaration should nevertheless be taken into custody for prosecution, and any commander who shall seize such a vessel, with such a person on board of her, and who attempts to exercise his judgment in respect to the validity of such an excuse breaks the law. It was early afterwards decided, by Judge Bee, of South Carolina, that any person might make a seizure of such vessel for condemnation under the act. His ruling was affirmed by the supreme court of the United States in the case of The Josefa Segunda, 10 Wheat. [23 U. S.] 331. The act also gives to the president of the United States the naval forces to be employed in enforcing it. It provides for the punishment of the master of the vessel seized, subjecting him to a fine not exceeding ten thousand dollars and imprisonment of not less than two and not more than four years.

The next act of congress was passed on the 2d March, 1807 [2 Stat. 426], when Mr. Jefferson was president. I will hereafter show that it was done upon his official suggestion; and I only do so now from unwillingness to divert your minds into another train of thought from the legislation itself. The act of 1807 begins by subjecting any vessel to forfeiture which shall be found in any river, bay, or harbor, or on the high seas within the jurisdiction or limits of the United States, or which may be hovering on the coast, having on board any negro, mulatto, or person of color for the purpose of selling them as slaves, or with the intent to land them in any port or place within the United States.

The act of 1818 [3 Stat. 450] prohibits the importation of negroes altogether into the United States from any foreign kingdom, place or country, without excluding the return to it of such slaves as might leave the United States as servants of their owners, comprehending such as have been employed as seamen on a foreign voyage. U. S. v. The Garonne, 11 Pet. [36 U. S.] 73. The ship in which they are brought is forfeited. It also forfeits any vessel built or equipped for the purpose of bringing slaves into the United States, or for the purpose of transporting them to any foreign country, and any preparation which clearly manifests an intent to prosecute a slave voyage, constitutes a fitting out under the act. This offence being by the act a misdemeanor, all concerned in it are principals. U. S. v. Gooding, 12 Wheat. [25 U. S.] 460. The penalty under the act for fitting out vessels for the slave trade, and all persons in any way concerned, is a fine not less than $1,000 nor more than $4,000, and imprisonment which may be extended from three to seven years. It also inflicts other and severe penalties upon citizens of the United States, and other persons residing therein, for being concerned in the slave trade, either on shore or at sea, and it provides, as previous acts did, against carrying slaves from one port to another in a foreign country. The Merino, 9 Wheat. [22 U. S.] 391. It takes from the importer of slaves, and from any other person claiming them under him, or who may have bought from his agent, any right, title or interest whatever in the service or labor of any negro, mulatto, or other person of color, so acquired. The purchaser of such slaves may be punished. Those also who may have aided or abetted the importation of such slaves, and all persons are punishable who now hold, sell, or otherwise dispose of any negro, with intent to make him a slave, who shall know that he was introduced into the United States contrary to law. And in the eighth section of the act it is declared that in all prosecutions under it, the defendant shall

be held to prove that the negro, mulatto, or person of color, which he shall be charged with having brought into the United States, or with having purchased, or with having held or sold, or otherwise having disposed of, was brought into the United States five years before the commencement of the prosecution, or that he was not brought into it contrary to the provisions of the act. On failure of neither being done by the person charged, he shall be adjudged guilty of the offence with which he may stand charged under the act. By which understanding that after the prosecuting officer has made out a prima facie case, that a negro or mulatto is in possession of the accused, who has been brought into the United States contrary to law, that the burden of proof is cast upon the holder of the negro to exempt himself from the penalties of the law.

The act of 1819 [3 Stat. 532] authorizes the president in a more particular manner than has been done before, to use the naval force for the prevention of the slave trade, points out the circumstances and the localities in which seizures of vessels may be made, directs the distribution of the proceeds of them after condemnation, requires that negroes found on board of them shall be delivered to the marshal, what that officer's duty then is, and again commands that the officer making the seizure shall take into his custody · every person found on board, being of the crew or officers of the vessel seized, and that they are to be turned over to the civil authority for prosecution. A bounty of twenty-five dollars is to be given for the detection of every negro, &c., &c., brought into the United States contrary to law, which the secretary of the treasury is authorized to pay to the informer. The government is also authorized to pay a specific sum to any person who shall lodge information with the district attorney of any state or territory into which negroes have been introduced, contrary to the provisions of this act. It is then made that officer's duty to commence a prosecution, by information, to ascertain the fact of the unlawful introduction, and process is issued against the person charged with holding any such negro. If upon the return of the process executed it shall be ascertained by the verdict of a jury that the negro has been brought into the United States as the informer had alleged, he is entitled to receive fifty dollars for each negro delivered to the marshal or of whom that officer may get the possession. I have been more particular in reciting what should be the proceedings, on account of it not having been pursued, when a number of Africans supposed to be of the Wanderer cargo were in the possession of an officer from whom they were taken, by the intervention of a state officer's warrant, without there being the slightest authority for doing so. I suggest, as the release of the Africans alluded to was a nullity, that proceedings against the persons concerned in it may still be instituted in vindication of the violation of the laws of the United States, and that new proceedings may be brought upon the proper affidavit of any one that any other person was or is in possession of any of the negroes brought in by the Wanderer, for carrying out the United States law to its conclusion, for the benefit of whoever was or may become the informer.

This brings us to the last act upon the subject,—that of the 15th May, 1820 [3 Stat. 600]. It denounces any citizen of the United States as a pirate, and that he shall suffer death who shall become one of the crew of a ship's company of any foreign ship; and that any person whatever becomes a pirate and, shall suffer death, who shall become one the crew or ship's company of any vessel owned in the whole or in parts, or which shall be navigated for or in behalf of any citizen of the United States, or who shall land from such vessel on any foreign shore and shall seize any negro or mulatto not held to service or labor by the laws of either of the states or territories of the United States, with intent to make such negro or mulatto a slave, or 'who shall decoy or forcibly bring or carry or who shall receive on board of such ship any negro or mulatto with intent to make him a slave. The fifth section of the act declares that, if either of the same class of persons in the same classes of vessels shall forcibly confine or detain, or abet or aid, to do so, any negro or mulatto on either of such ships, not held to service or labor by the laws of either of the states or territories of the United States, with intent to make them slaves, or who shall on board any such ships offer or attempt to sell as a slave any negro or mulatto not held to service by the laws of any of the states or territories of the United States with intent to make such persons slaves; or who shall on the high seas or any where on tide-water transfer over to any other ships or vessels, such persons intending to make them slaves; or shall land or deliver such persons with the same intent, or having already sold them, that such persons shall be adjudged pirates, and on conviction, shall suffer death. It was necessary to be minute in the recital of this act, or you could not have had a correct idea of it.

Such, gentlemen, has been the legislation of congress to prohibit and to punish the introduction of slaves into the United States from abroad by our own citizens or by foreigners. It will be found in the history which I shall give of that legislation, that it is the result of an early and continued disapproval by the people of the United States, both north and south, of the African slave trade. In all of which, from the very beginning of our nationality, the distinguished men of both sections took an active part, none of them more decisively than southern statesmen, in every act that has been passed, including the last. There has never been any manifestation of popular or sectional discontent against them on account of their opinions concerning the African slave trade, or their legislation to repress it. The acts for that purpose have never been complained of but by those who had subjected themselves to their penalties, or who feared that they might be so, or by a few gentlemen, the sincerity of whose convictions cannot be doubted, but have not as yet in their speeches or publications commanded much attention for their knowledge of the history of our legislation, or for their expositions of constitutional laws upon the subject. No serious attempt has been made to repeal any one of those acts, and no one in a condition to do so has been found to propose it with an earnest and zealous affort to accomplish that. They have been acquiesced in, and had a popular approval from the first act that was passed to the last, inclusive. The judicial infliction of the penalties of those acts, which has been frequently done, has always been considered the legal and just consequence of the constitutional provision which gives to congress the power to prohibit the importation of slaves into the United States after the year 1807.

The acts of 1818, 1819, 1820, severe as they may seem to be, particularly the last, had the active and marked support of the most distinguished representatives in congress from the state of South Carolina, and that of the ablest representatives of every other state in the Union. There was but one opinion in the senate and house of representatives that the treaty engagement of the United States with Great Britain, the times and the circumstances of it, called for such acts in favor of humanity. They were necessary to vindicate our national sincerity from almost an imputation of connivance at the violations on our coast of our acts for the suppression of the slave trade. What those circumstances were will be shown by the narrative I shall now give you. At no-

time has modern commerce been assailed by more extensive or more brutal piracies and murders than it was in the year 1815, and for thirty years afterward.

The general pacification in Europe in 1814, and that of the United States with Great Britain, threw out of employment numbers of men who had been accustomed to the violence of war and to the hazards and gains of privateering. They were unfitted for any quiet social conditions, were without daily occurring or expected causes of excitement, and had not those virtues suited to the pursuits of peace. Their vessels had been built, and equipped and manned for pursuit and for flight, and were unfit for the carrying trade of commerce. Many of them were soon employed in a force trade, and in smuggling on every shore of the Atlantic. The transition to piracy soon followed. I believe (for I speak from the history of that day and from public documents) that there was no nation in Europe some of whose vessels were not so used, and many of those of the United States were navigated by our citizens and by foreigners for the same purpose. In the latter part of the year 1816, and during the following year, vessels of that class were on the coasts of this continent from Cape Horn to the Gulf of Florida. At first they were pirates without combinations, but afterwards became associated and had places of depot for the sale and division of their spoil. Those places were on the uninhabited Atlantic coast of America, and those localities are now known. At length an adventurer, daring and knowing, conceived an idea and executed it, to make the Island of Fernandina their rendezvous. He seized it, declaring it to be no longer a dependence of Spain, and organized a government there, in conjunction with citizens of the United States who were men of broken fortunes at home. They claimed for themselves the privileges of nationality, invited an accession of numbers from every part of the world, recruited them as soldiers, and employed them on board of cruisers which had commissions of their own, with simulated documentary papers of the United States and the nations of Europe. Spain could not dislodge them. Our negotiations were then going on for the purchase of Florida. In a short time the little island (now probably to become a city of note) was filled with the stolen products of commerce. The plan was to smuggle them into the adjoining districts of the United States, overland by the way of Florida, and from points on the St. Mary's river into the interior. Our citizens from the north and the south did not resist the temptation; men from the utmost east of the United States and the nearer south to the locality were there for unlawful purposes, just as they had been a few years before, during the war, of the United States and England, to smuggle our cotton into Fernandina on English account, and in return, to smuggle into the United States the fabrics of her manufacturers. In a short time this assumed government opened the island as a depot for slaves from Africa. Two cargoes of them arrived there in the year 1818, in such a condition of misery from long confinement, starvation and scourging, that the representation of it caused all over the United States a deep and indignant sympathy. Those, and there were but few of them who survived, were bought by a citizen of the state of Pennsylvania, and by a resident merchant of Savannah, and were successfully introduced into the United States. A third cargo arrived under like circumstances and with the same results. It was known that others would follow, and with a proper regard for humanity, and the political interest of the nation. Mr. Monroe, then president, determined to take possession of the island. It was done by a military force. The late Gen. Bankhead commanded the expedition. Aury's government and forces, after

a show of resistance, surrendered. Himself and his officers fled, and thus an end was put to their combination for smuggling and piracy. It must not be supposed, however, that a gush of sympathy from such a cause led to the enactments of the act of 1820. It had a deeper and a wider foundation, as you will presently see, in the long standing conviction of the American people, that the African slave trade was wrong in itself.

Your attention will now be called to the history of the legislation of congress to prohibit the African slave trade, with especial reference to the religious, moral, and political considerations on which it rests, and to the constitutionality of the act of 1820, making the trade piracy, punishable with death. The colonial history of the states, in my judicial circuit, North and South Carolina, and Georgia, exhibits the existence of a profound impression among the people that the slave trade was not a legitimate commerce, but that it involved the perpetration of enormous crimes. The same feeling, belief, and opinion had been frequently expressed in Virginia, and Maryland manifested the same sentiments and disposition to abolish it; all of them suggested measures for its discouragement. This sentiment, common indeed to all the colonists, was expressed by the first constitutional congress of 1774, in its adoption, unanimously, by all the colonies, of the non-importation, non-consumption, and non-exportation agreement, and with more emphasis by the congress of 1776. That congress resolved that the importation of African slaves should be abandoned, and for a time there was no state in which the trade was tolerated. The provisions of the federal constitution were settled with much deliberation and care. They were reported by a committee formed by a member from each state, and their report, with amendments, was adopted as the complete and final adjustment of our constitutional arrangement of that subject. This adjustment contemplated that either of the states, "then existing," should retain its power to admit slaves until the year eighteen hundred and eight, and that after the year eighteen hundred and seven, congress should have plenary authority to regulate or prohibit it. Mr. Madison expressed the sense of the federal convention, when he said, in the Virginia convention, "it appeared to him that the general government would not intermeddle with that property for twenty years, but to lay a tax on every slave imported, not exceeding ten dollars, and that after the expiration of that period, they might prohibit the traffic altogether." But the reservation of the power to "the United States" to admit Africans to be held as slaves, was opposed with much earnestness in the federal convention that passed it, and was regarded as a serious objection in many of the conventions assembled in the different states to ratify the constitution. The limitation of the powers of the United States to legislate upon the subject, did not extend to the trade with foreign nations or to the territories.

In the years 1794 and 1800, during the administrations of General Washington and Mr. Adams, American ships and American seamen were prohibited from engaging in or carrying on the slave trade among foreign nations, under heavy penalties. In 1798 and in 1804, the trade was prohibited in the Mississippi and Louisiana territories, comprising, then, all the slaveholding territories of the United States. In the year 1806, President Jefferson congratulated congress upon the approach of that period when its power became plenary, and invited it to pass suitable laws for the final suppression of the trade. The prohibitory sections of the act of 1807 were adopted with unusual harmony of sentiment by congress, and were the result of Mr. Jefferson's recommendations. It was said in the debate that took place upon that bill, that the sentiment was general for the

abolition of the slave trade, and that the only inquiry was, how it could be most effectually done.

In the treaty of peace concluded at Ghent between the United States and Great Britain, the trade was pronounced to be "irreconcilable with humanity and justice," and the contracting parties engaged to use their best endeavors for its abolition. In 1818, 1819, and 1820 the laws of the United States upon the subject were revised, and additional severity given to the enactments. Thus it is seen that during the administrations of the first five presidents, all of whom were concerned in settling the foundations of the government, a series of laws, based upon a common principle, and having a common end, have been adopted by the united and concurring views of the states and the people for the suppression of the African slave trade. The power of congress to suppress the slave trade, by passing all laws necessary and proper for that purpose, is not questioned by any one at all conversant with the constitution and constitutional history of the United States. As a matter of commerce, the power of congress to regulate the foreign slave trade is plenary and conclusive. As it affects navigation and the police of the ocean and seas, the power given to define and punish piracies and felonies on the high seas is without limitation. And in so far as it affects intercourse with the inhabitants of another continent, and the relation which shall exist between our citizens and those inhabitants, the power of congress to determine upon that intercourse, and to control the citizens of the United States in regard to it, is absolute and unconditional.

The acts of congress relating to the slave trade divide the offenders into three classes, and apportion various degrees of punishment among them. I shall speak of but one of them. The class treated as the most criminal, upon whom the denunciation of punishment falls most severely, comprises the crew of the ship's company of the vessel, who are immediately employed in carrying on the trade. The act of congress of May, 1820 [3 Stat. 600] describes this class as the crew or ship's company of any American vessel, or the citizens of the United States employed in any foreign vessel engaged in the slave trade. The supreme court of the United States have said in reference to a similar enactment: "As to our citizens, there is no reason why they should be exempted from the operation of the law of the country, even though in foreign service. Their subjection to those laws follows them every where." The crimes described in this act have been already mentioned in almost the language of it, but in the connection the repetition with greater brevity will be allowable. Those crimes may be committed by landing from any such vessel, and on any foreign shore seizing a negro or mulatto not a slave under any state or territorial law of the United States with intent to make him a slave; or by forcibly or fraudulently decoying or abducting such a person to such ship or vessel, or forcibly confining or detaining him on board with such an intent, or selling or attempting to sell him as a slave on the high seas, or landing him from the vessel, with such intent. The person transgressing in either of the particulars mentioned is to be adjudged a pirate, and the penalty is death. The crime of kidnapping the inhabitant of another country by a citizen of the United States, or by the employment of an American vessel, is as plainly within the power of congress to define and punish and denominate it piracy as it would be for congress to punish for piracy the crew of any vessel who might land upon the shore of the United States with the intent to kidnap, or who should kidnap, the citizens of the United States, or the negro slaves on plantations situated on the coast of the United States. In either case it belongs to congress to affix the punishment for the offence, upon

its own convictions of its enormity and its mischievous tendency. The denomination applied to the offender is of no importance to the character of the act, though without designation otherwise, it may be as to the punishment of the offence. But there can be no difficulty in vindicating the classification of the offence described in the act as piracy. The acts of 1794, 1800, 1807, and 1818, abolished the slave trade, and prohibited the employment of American seamen and vessels, either in the foreign slave trade or in the importation of slaves to the United States. The American citizen was not allowed to acquire any title to the subject of such traffic, from any person concerned in it. The right of the inhabitants of Africa to their liberty to be inviolable by the inhabitants of the United States. To this limited extent they were placed upon the same conditions as the inhabitants of any other country. From a remote antiquity, the seizure and abduction of men and women, with the intent to dispose of them as slaves, by the crew or ship's company of vessels roaming at large for the purpose of plunder and traffic, have been deemed and always called acts of piracy. It was a capital offence by the Jewish law, and to steal a human being, man, woman or child, or to seize and forcibly carry away any person whatever from his own country into another, has always been considered to be piracy, and is now so considered by all nations enjoying Jewish and Christian instruction, punishable with death. The exclusion of the inhabitants of Africa from such protection, so far as the nations of Europe are concerned, commenced in the early part of the fourteenth century; the Portuguese having then begun the traffic in slaves from the western shores of that continent. But they placed their right to do so, and the exercise of it, upon the Roman law of "Jure gentium, servi nostri sunt qui ab hostibus capiuntur." Nor was it ever recognized in Europe to be allowable trade upon any other principle, until the emperor Charles V. authorized, in 1516, the introduction of Africans into the island of St. Domingo, from the establishments of the Portuguese on the coast of Guinea, to work the mines in that island. It was subsequently sanctioned by the nations of Europe for the same purpose and for agricultural labor, and for the last it was introduced by all of them into their respective colonial possessions in America. But now the sanction of all of them for such a trade having been withdrawn, and all of them having declared it to be piracy, the natural rights of the inhabitants of Africa are secured against the violation of them by their respective citizens and subjects, as to the transportation of them to any port of the world, with intent to make them slaves. A classical writer upon the manners of the ancient Greeks informs us: "The supply by war of slaves, there seldom equalled the demand; in consequence a race of kidnappers sprung up, partly merchants and partly pirates, who roamed about the shores of the Mediterranean, as such miscreants do now about the slave coasts, picking up solitary and unprotected individuals. Greek and Roman authorities tell us that when the Selesian pirates had the possession of the Mediterranean, as many as ten thousand slaves were said to have been imported and sold in one day." Lord Stowell describes a pirate "as one who renounces every country, and ravages every country on its coasts, and vessels indiscriminately." And it is quite clear, politically and judicially, that a pirate is one who, without a commission from any public and recognized authority, shall ravage the coasts or vessels of any country indiscriminately. Mr. Jefferson, in his draft of the Declaration of Independence, denounces the African slave trade "as a piratical warfare, the opprobrium of infidel nations."

The motives and considerations which induced congress, with scarcely a division, to enact

the law of May, 1820 [3 Stat. 600], are fully explained in the report of the committee of the house of representatives. which recommended the passage of the bill. "Congress," say the committee, "have heretofore marked with decided reprobation the authors and abettors of this iniquitous commerce in every form which it assumes, from the inception of its unrighteous purposes in America, through all the subsequent steps of its progress to its final consummation,—the outward voyage, the cruel seizure and forcible abduction of the unfortunate African from his native home, and the fraudulent transfer and sale of the person so acquired. It may, however, be questioned if a proper discrimination of their relative guilt has entered into the measure of punishment annexed to their criminal acts. Your committee cannot perceive wherein the offence of kidnapping an unoffending inhabitant of a foreign country, in chaining him down for a series of days, weeks, and months, amidst the dying and the dead, to the pestilential hold of a slave ship; of consigning him, if he chance to live out the voyage, to perpetual slavery in a remote and unknown land, differs in malignity from piracy, and why a milder punishment should follow the one than the other crime. Are there not united in this offence all that is most iniquitous in theft, most daring in robbery, and cruel in murder? If the internal wars of Africa and their desolating effects may be imputed to the slave trade,—and that the greater part of them must, cannot now be questioned,—his crime, considered in its remote as well as its proximate consequences, is the very darkest in the whole catalogue of human iniquities, and its authors should be regarded as hostes humani generis." In the year 1823, the house of representatives of congress adopted a resolution to request the president to prosecute, from time to time, negotiations with the several maritime powers of Europe and of America, for the effectual abolition of the African slave trade and its ultimate annunciation as piracy under the laws of nations by the consent of the civilized world. This resolution was adopted by a vote of 139 yeas to 9 nays, and among those who voted for it, were Mr. Buchanan, now our president; Mr. McLane, of Delaware; Mr. Poinsett, Mr. McDuffie, and General Hamilton, of South Carolina; Mr. Reid, of Georgia; Mr. Sergeant, of Pennsylvania; Stevenson, of Virginia, and Williams, of North Carolina. Charles Fenton Mercer, of Virginia, the mover of the resolution, said that technical objections have been urged and sneers have been indulged against the legal accuracy of the application of the term "piracy" to the offence. Such criticism has no sound reason to sustain it. The law of nations is in part natural, in part conventional. Its only sanction is to be found in the physical force; its authority in the express or local consent of nations. The consent of nations may make piracy of any offence on the seas. In seeking a denomination for a new crime, it is not necessary to invent a new term. The object of classing the prohibited act under an old title, is to provide for the former a definite and complete remedy. Piracy, under the law of nations, is alike understood and punished by all nations. And is there no analogy between the African slave trade and the offence of piracy, which would warrant the proposed classification of the former crime under the latter title? It may sometimes be difficult, amidst conflicting authorities, to say what is not piracy, but it cannot be so to determine what is. It is robbery on the high seas without a lawful commission from any recognized authority to take from a vessel, without color of law, a single package of goods. And is it not robbery to seize, not the property of the man, but the man himself; to chain him down, with hundreds of his fellows, in the pestilential hold of a slave ship, in order, if he chance to survive the voyage, to sell him to a foreign master? By a former law, almost coeval with our constitution, we made murder on the high seas piracy. The seizure of an African by the landing of the crew of a vessel with intent to make him a slave in a foreign land is kidnapping, and its consummation on the high seas is within the power of congress to "define and punish piracies." Search the etymology of the term of "piracy," and its applications to crimes, and nothing restricts it to the injuries to property, or to offences which have their inception and termination on the high seas. The act of violation may begin on the shore and be continued on the ocean for the consummation of its intentions elsewhere, and congress may define it to be either a piracy or a felony, according to its sense of the enormity of the purpose or intention of the persons concerned in it. Congress has defined it to be piracy, and has declared that it shall be punished with death.

The act of 15th May, 1820 [3 Stat. 600], on this subject, was a consummation of its legislation for the complete abolition of the slave trade. It was not passed under any momentary excitement or impulse, but it was the deliberate and considered act of the federal government to carry out a policy that had been disclosed in the first days of our existence as a free and independent people, and which in every stage of its history had been sanctioned by the moral sense of the people. Under the resolution before mentioned, which was so triumphantly passed in the house of representatives, the executive government entered upon negotiations with Great Britain, and in the year 1824 its parliament followed the lead of this country in designating the crime of abducting Africans from their shores to make them slaves as piracy. All the nations of Europe, as well as of America, have followed in the same legislation, and the object of the resolution of 1824 seems to be near its accomplishment.

Upon three occasions since 1824, the subject has been under the consideration of congress, and at each time has a determination been fully expressed to maintain the principles that had been incorporated into the legislation of the country. No part of it has been more explicit in that declaration than the states in my judicial circuit. Georgia declared in her constitution of 1798 that there should be no future importation of slaves into the state, from Africa, or any foreign place, after the first day of October ensuing. South Carolina prohibited negroes and slaves of any color from being brought into the state as early as the 4th November, 1788. That state's act of the 21st December, 1792, is to the same purpose, with this addition, that there should be no importation of slaves or negroes, mulattoes or Indians, Moors or mestizoes, bound to service for a term of years. And her repeated legislation from that time to the year 1803, extended and renewed the prohibition of the importation of slaves into that state. And it is a little amusing too, that the origin of the present African apprentice system was begun in attempts to violate her laws forbidding the importation of slaves or negroes under the pretence that they were only bound to service for a term of years. But the artifice was discovered. and the state has the credit of having accommodated her legislation to the fraud, so as to prevent and punish it. When the constitution was under discussion, the convention of North Carolina had no legislation directly to prohibit the importation of slaves. It only imposed duties upon the introduction of them into that state; but since the ratification of the constitution no state in the Union has more faithfully kept the act of congress prohibiting the importation of slaves, unless it be the state of South Carolina, for from what I have judicially witnessed in that state, I can say, notwithstanding there are

a few there who are active advocates for the renewal of the slave trade, that the people of that state are not at all likely to recede from their long standing policy in that regard. In 1826, in the discussion of the Panama mission, Col. Hayne, a member of the senate from the state of South Carolina, said: "The United States were the first to set their faces against the slave trade, and the first to repress it among her citizens. We are entitled to the honor of having effectually accomplished this great object; not more by the force of our laws than by the omnipotent power of public opinion. In all measures of this character every portion of our fellow-citizens have cordially co-operated, and even in those states where slavery exists, the people have gone heart and hand with the government in every measure calculated to cut up this nefarious trade by the roots. In the state which I have the honor to represent, any man concerned directly or indirectly in this traffic would be indignantly driven out of society." Mr. Johnson, a member of the senate from Louisiana, said: "A general accordance in principle and sentiment prevails throughout the civilized world in regard to the duty and obligation of nations to exterminate the slave trade. It is the prevailing feeling of the age. This inhuman traffic, which fills the world with misery, ought to be effectually suppressed. It belongs to Christian nations to put an end to this infamous practice, with all the crimes and horrors that follow its commission." Judge Berrien, of Georgia, said: "For myself, I abhor the slave trade. It is abhorred by my constituents. Even at the time when it was tolerated by our laws, it was not in the Southern portion of this Union that its practical advocates were found." At a later period in the history of the country, 1853, the United States was called upon to consider the measures for the execution of the treaty of Ghent with Great Britain, relative to the suppression of the slave trade. These measures will be found in the treaty negotiated at Washington with that power, frequently called the "Webster-Ashburton Treaty." That treaty was ratified, and is now a part of the law of the land. The eighth article requires "both countries to prepare, equip, and maintain in service on the coast of Africa a sufficient and adequate squadron to enforce separately and respectively the laws, rights, and obligations of each of the two countries for the suppression of the slave trade." The ninth article recites that notwithstanding all efforts which may be made on the coast of Africa for suppressing the slave trade, the facilities for carrying on that trade and avoiding the vigilance of cruisers by the fraudulent use of flags and other means are so great, and the temptations so strong for pursuing it, while a market can be found for slaves, that the desired result may be long delayed unless all markets be shut against the purchase of African negroes. The parties to this treaty agree that they will unite in all becoming representations and remonstrances with any and all powers within whose dominions such markets are allowed to exist; and that they will urge upon all such powers the propriety of closing such markets at once and forever. This treaty was ratified by the senate by a vote of 39 ayes to 9 nays, three of those who voted in the negative representing slaveholding states. One of those was Col. Benton, and one of the grounds of his objection to the treaty was the clause just recited, but he declared the trade itself diabolical and infamous.

The constitution of the United States, mainly made by slaveholding states, authorized congress to put an end to the importation of slaves by a given day. Anticipating the limited day by legislation, congress had the law ready to take effect on the day permitted. On the 1st day of January, 1808, Mr. Jefferson being president, the importation of slaves became un-

lawful and criminal. A subsequent act following up the idea of Mr. Jefferson in the first draught of the Declaration of Independence, qualified the crime as piratical and delivered up its pursuers to the sword of justice, as the enemies of the human race. Vessels of war cruising on the coast of Africa under our act of 1819 [3 Stat. 532] have been directed to search our own vessels, to arrest the violators of the law, to bring in the ships for condemnation, and the men for punishment. At this time the government is not unmindful of this treaty obligation, for our next squadron for the coast of Africa will consist, I believe, of four steamers and as many sloops-of-war, and four steam ships will probably cruise off Cuba to intercept slaves that may escape the ships on the African coast. Mr. Calhoun voted for the ratification of the treaty, and expressed his clear convictions "that the policy of closing the markets of the world was both right and expedient in every point of view, that we were deeply committed against the traffic, both by legislation and treaty. The influence and the efforts of the civilized world were directed against it, and that too under our lead at the commencement." Still later, in 1855, the house of representatives, by a vote nearly unanimous, decided that it was not expedient to repeal the laws for the suppression of the slave trade.

The leading points in the legislative history of the laws under discussion have been referred to, to show upon what solid foundations of authority and consent on the part of the executive and legislative departments of the government, the laws for the suppression of the slave trade rest. No doubt has been entertained by the long succession of jurists and statesmen who have been concerned in their discussion and enactment of the constitutional power of congress to pass them. There is no question of public morality which has been more clearly and solemnly maintained than that on which this legislation reposes. It would be a retrograde movement of more than a century to consent to abate one line of the condemnation of this trade, or to relax any effort for its extirpation. Many of the clauses of these laws have come before the judiciary department of the United States for interpretation; property has been sentenced to confiscation, and men have been tried and some condemned, for the violation of them. Not a question has been decided in the circuit or in the supreme court which in any manner impugns their validity as constitutional enactments.

Having thus given you, gentlemen, the acts and their legislative history, all of which have hitherto had the support and concurrence of the people of the United States, and by no part of the people more so than by the people of the slave-holding states: should cases of the kind be submitted to you by the district attorney, you will no doubt show yourselves true and faithful to the constitution and laws of our country.